# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

DANESSA L. ERICKSON,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

No. C07-3024-MWB

**REPORT AND RECOMMENDATION**

---

## I. INTRODUCTION

The plaintiff Danessa L. Erickson seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title XVI supplemental security income ("SSI") benefits. Erickson claims the ALJ erred in finding she is not disabled. (*See* Doc. No. 10)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On May 23, 2002, Erickson protectively filed an application for SSI benefits, alleging a disability onset date of January 1, 2002. (R. 47-49). She later amended her alleged onset date to October 1, 2002. (R. 403) At the time she filed her application, Erickson claimed she was disabled due to "a joint problem" that caused her joints "to dislocate," and "mental conditions." (R. 52) She claimed these conditions prevented her from working because she was unable to sit or stand for lengthy periods of time, and pain and depression affected her work attendance and concentration. (*Id.*)

Erickson's application was denied initially and on reconsideration. (*See* R. 27-37) Erickson requested a hearing, and a hearing was held on June 10, 2004, before

Administrative Law Judge ("ALJ") Nancy Alden. Erickson was represented at the hearing by attorney Kenneth A. Johnson. Erickson testified at the hearing, and Vocational Expert ("VE") Carma A. Mitchell also testified. (R. 363-400) On July 30, 2004, the ALJ found that Erickson retains the residual functional capacity to perform a limited range of light work and the full range of sedentary work, and she therefore is not disabled. (R. 12-21) Erickson appealed the ALJ's ruling, and on April 15, 2005, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 7-10) Erickson requested judicial review by the United States District Court for the Southern District of Iowa. The Commissioner asked the court to reverse the decision and remand the case for further consideration of the opinion of Erickson's treating rheumatologist and evaluation of other evidence. (R. 304-05; page 2 of the motion is missing from the record) On January 3, 2006, the court granted the Commissioner's motion for reversal and remand, entered final judgment in Erickson's favor, and remanded the case to the Commissioner for further consideration. (R. 303)

On July 18, 2006, a supplemental hearing was held before ALJ John E. Sandbothe. (R. 401-25) ALJ Sandbothe indicated the district court had directed him to "evaluate the claimant's subjective complaints, provide proper rationale, consider the claimant's maximum residual functional capacity, and obtain vocational expert clarification of . . . the assessment of the claimant's residual functional capacity." (R. 283) On January 10, 2007, ALJ Sandbothe also found that Erickson was not disabled. (R. 280-88) This decision stands as the final decision of the Commissioner.

Erickson filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Erickson filed a brief supporting her claim on September 17,

2007.  (Doc. No. 9)  On January 16, 2008, the Commissioner filed a brief and motion for another remand for further consideration.  (Doc. No. 13)  The Commissioner notes the record is missing one page of the second ALJ's decision in the case, and in addition, "the record remains deficient, particularly with regard to the limiting effects of Plaintiff's fibromyalgia."  (Doc. No. 15, p. 4)

Remand under sentence four requires a plenary review of the record and "a substantive ruling regarding the case, rather than merely returning the case to the agency for disposition."  *Hanson v. Chater*, 895 F. Supp. 1279, 1282-83 (N.D. Iowa 1995) ("Absent a judgment or substantive ruling in the case, a remand is not permitted under sentence four of 42 U.S.C. § 405(g).") (citing *Shalala v. Schaefer*, 509 U.S. 292, 299-300, 113 S. Ct. 2625, 2630, 125 L. Ed. 2d 239 (1993); *Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S. Ct. 2157, 2163, 115 L. Ed. 2d 78 (1991)).  The court finds the missing page of the ALJ's decision is not critical to a plenary review of the record.  The missing page begins immediately after the ALJ summarizes and explains his concurrence with the Vocational Expert's testimony in response to the ALJ's hypothetical questions.  The missing page would set forth the ALJ's findings in numbered paragraphs; however, those findings are discussed fully in the body of the ALJ's decision.  The court finds the ALJ's decision is sufficiently complete for purposes of judicial review.  Therefore, the Commissioner's request for remand on the basis of the missing page is **denied**.

The Commissioner further seeks remand to allow the ALJ to "properly evaluate the opinion(s) of [Erickson's] treating rheumatologist, Mary Radia, D.O., and articulate the weight given to her opinion(s)"; "re-evaluate [Erickson's] fibromyalgia, re-evaluate the medical evidence, and obtain expert medical testimony or recontact the treating physician if necessary"; and "further develop the record."  (Doc. No. 15, p. 5)  The court will consider whether remand is appropriate for these reasons upon its plenary review of the

record.  Notably, Erickson does not resist the Commissioner's motion to remand pursuant to sentence four of 42 U.S.C. § 405(g).  (Doc. No. 17)

The court now turns to a review of Erickson's claim pursuant to 42 U.S.C. § 405(g).

## B.  Factual Background

### 1.  Introductory facts and Erickson's hearing testimony

#### a.  June 10, 2004, hearing

At the time of her first hearing, Erickson was thirty-three years old.  She has a ninth grade education, and her past work has included cleaning houses and doing telephone surveys.  (R. 366)  She lives in a house with her two children, both of whom receive SSI benefits.  She also receives food stamps and other types of public assistance.  (R. 372)

Erickson claims she cannot work because she has burning pain all over her body, with the worst pain in her knees, lower back, shoulders, and neck.  The pain affects her ability to concentrate.  The pain sometimes varies in its intensity between about a 5 and a 9 on a 10-point scale.  Damp weather, sitting for too long, and standing for too long make her pain worse.  She takes Neurontin 300 mg. three times a day for the pain.  The medication does not seem to help her pain much, but it makes her sleepy and helps her sleep.  She also takes Effexor and Trazodone for depression and to help her sleep.  (R. 366-69)

Erickson estimated she can sit for five to ten minutes before she has to stand up, and stand for a similar period of time before she has to sit down.  If she sits for too long, her "legs go numb and [her] hips begin to hurt."  (R. 370)  She experiences similar symptoms if she stands for too long.  She estimated she could stand for no more than half an hour, total, in an eight-hour work day.  She also could sit for half an hour during the day.  The

remainder of the time, she would be lying down. She spends the majority of her time every day lying down, either in bed or on the couch. (R. 369-71)

Erickson estimated she can lift no more than ten pounds. She has problems climbing stairs. (R. 371-72) She does her own housework, but does everything slowly, and she cannot do any yard work. She can drive a car, but she gets disoriented easily, starts to sweat, and forgets where she is going. For enjoyment, she watches television. Her children are ages 14 and 12, and they take care of their own personal needs. (R. 372-73, 385)

Erickson used to have a problem with alcohol, but according to her, she quit abusing alcohol more than a year prior to the hearing, and she had not consumed any alcohol for several months prior to the hearing. She took some LSD as a teenager, but otherwise, she has not used illegal drugs. (R. 374-76)

Erickson was raped in 2001, and since that time, she has been anxious, somewhat paranoid, and has had concentration problems. She lost her job and her car subsequent to the incident. She is "[v]ery leery" of strangers and has difficulty being around people, even family members and friends. Being around people makes her begin to sweat and feel disoriented, and she often feels like people are watching her. She tends to be very tense, irritable, and easily frustrated, and these traits have increased since the incident. In addition, she is unable to maintain a romantic relationship due to her distrust of others, "especially men." (R. 377-78) If she worked in a job that required her to wait on male customers, she would be uncomfortable, "creeped out and worried." (R. 379, 385)

Erickson did telephone survey work after the incident, but she "walked out" of the job because she had difficulty concentrating and she was unable to be the "chipper, happy, smiling person" she felt the job required. (R. 381) She tried cleaning houses but quit when her "body couldn't handle it." (*Id.*) She feels she would be unable to get herself up, dressed, and out the door to go to work because she has "[n]o motivation," "feel[s]

like crap all the time," and does not like dealing with people. (*Id.*) She has crying spells two or three times a week, and sometimes she cries off and on all day long. (R. 381-82) She feels she is unable to perform any full-time job, stating she would miss work frequently due to her inability to function. (R. 384-85)

After she was raped, Erickson went to counseling a few times, but she stopped because she felt the sessions were not helping her and she did not want to keep talking about the incident. Further counseling was recommended but she declined. She was not seeing a psychiatrist or psychologist at the time of the hearing, indicating she lacked any motivation to do so, and it was too difficult to get herself out of bed to go. Her medications for mental health issues at that time were prescribed by Mary A. Radia, D.O., the doctor Erickson was seeing in connection with her fibromyalgia. (R. 382-83) Erickson often has trouble getting out of bed, and she often stays in bed for days at a time, only getting up to use the bathroom and get something to eat. (R. 383)

### b.    July 18, 2006, hearing

Erickson had not worked at any time since her first ALJ hearing, and she had not attended school or taken any courses.

In January 2003, she began treatment for fibromyalgia. Her doctor recommended that she obtain a psychiatric evaluation, but Erickson has not followed through on that recommendation because she has tried counseling in the past and believes it does not help her. She takes Cymbalta and Wellbutrin, which are antidepressant medications. She also takes the antidepressant Trazodone, at bedtime. The medications seem to help at times, but not all the time. (R. 406-07, 410)

For pain, Erickson takes Tramadol and Neurontin. Her Neurontin dosage had been increased since her first hearing, to 1500 mg/day. She stated the Cymbalta dosage also was higher. (R. 407) The Tramadol makes her tired, and the Neurontin and Trazodone affect her ability to concentrate. (R. 410)

Since the first hearing, Erickson had moved from her residence of eleven years in Des Moines, Iowa, to a smaller house in Glidden, Iowa. She stated the upkeep of the Des Moines house had become too difficult for her, both physically and financially, resulting in the move. In Glidden, she is closer to her mother, who lives in Carroll, and her mother is able to help her with errands and watching Erickson's teenage children when necessary. Erickson's daughter does the yard work, and her children do most of the housework. (R. 407-09) Her car was repossessed because she was unable to work and make payments on the car. (R. 409-10)

Erickson used alcohol and other drugs when she was a teenager, and she drank off and on as an adult. She stopped drinking and using other drugs several years before the hearing. She is not good with dates, but estimated it was about 2002 when she stopped drinking due to her prescription medications "and just mental reasons." (R. 417) According to her, she has not used any alcohol or illicit drugs, and she has not abused any prescription drugs, since before her first hearing in June 2004. (R. 409)

Erickson finished the ninth grade in school, and she has problems with reading, writing, and arithmetic. She has difficulty focusing on what she reads. When she makes a purchase, she is unable to determine the amount of change she should get back. She stated she dropped out of school because of her learning difficulties, and also because her mother "was never around" and Erickson had to take care of herself. (R. 413-14)

Both of Erickson's children receive SSI benefits due to health problems. Erickson and her family live on the SSI payments, food stamps, energy assistance, welfare, and "FIPP." (R. 415-16)

At the time Erickson filed her application for benefits, she listed one of her jobs as security guard. At this hearing, she clarified her job duties in that position. She worked both as a security guard, which required her to do rounds, and as a gatekeeper, checking people or vehicles in and out. Both positions required her to keep some minimal records,

for example if she saw a disturbance or an unlocked door. None of her other jobs required her to keep any written records. (R. 420-21)

Erickson stated her physical condition generally has not changed since the time of her first hearing. She estimated she cannot lift more than ten pounds, and she can stand for only fifteen to twenty minutes at one time, for a total of less than two hours total in an eight-hour workday. She has to alternate positions and take frequent breaks, and she opined she would require at least two hours per day of rest during a normal workday. (R. 411-12) She estimated she can sit for no more than fifteen or twenty minutes before she has to "[k]ind of stand up or lean over," and it will be about ten minutes before she can return to a normal sitting position. (R. 418)

In response to questions by the ALJ, Erickson described her typical day and some of the limitations on her functional abilities as follows:

Q    [By ALJ] Tell me about your average day. When do you get up? When do you go to bed? What do you do in-between?

A    [By Erickson] I get up around 11:30 or noon. I get up and I make myself something to eat. I watch TV. I mean, I sit most of the time and then I get up. Walk around. I start hurting and then it's just kind of back and forth. Walking, getting up, sitting down, leaning over.

Q    Do you do your own chores, your own laundry, your own shopping?

A    My kids usually do most of the chores. I do the laundry on and off. I usually have to have the kids carry stuff for me.

Q    What kind of things are you capable of doing around the house to keep the household running?

A    I lean over the kitchen sink to do the dishes.

Q    And do you do the cooking?

A    Half yes, half no. My daughter helps with that.

Q    What kind of things do you do to keep yourself entertained?

| | |
|---|---|
| A | Usually just watch TV. |
| Q | Do you socialize at all? |
| A | I used to in Des Moines but now I don't. I just don't really hang around anybody. |
| Q | When you were still in Des Moines, which I assume is just six months ago or something like that. |
| A | Yes. |
| Q | What kind of socializing did you do in Des Moines? |
| A | My friend would come over. |
| Q | Do you have any hobbies? Anything that will take up your time? |
| A | The things I used to like to do I can't do anymore. |
| Q | You're 35 years old now. You could possibly live another 40 to 50 years. What do you intend on doing for the next 50 years? |
| A | I don't have any idea. |
| Q | Is there anything that you're looking forward to that you're going to strive for, hoping for? |
| A | Not at this time. |

(R. 418-20)


## 2. *Erickson's relevant medical history*

On January 17, 2001, Erickson was seen in an urgent care clinic with complaints of low back pain, left side worse than right, for one week. Motrin did not relieve her pain. She described the pain as a "constant achy feeling," and she also complained of increasing anxiety since a recent sexual assault. Doctors prescribed Darvocet for the pain, an antibiotic for a vaginal infection, and a consultation with a crisis team. (R. 174) On

January 18, 2001, Erickson underwent x-rays of her lumbar spine, with no negative findings. (R. 153)

From January 31, 2001, to June 11, 2001, Erickson saw a counselor at the Des Moines Pastoral Counseling Center, for counseling related to a sexual assault by a friend. Notes indicate the rape resulted in "high levels of anxiety, fearfulness and poor concentration, as well as some stomach pain . . . [and] sleep difficulties." (R. 115) Erickson reported a history of alcohol and drug abuse since age fourteen, and stated she had received outpatient chemical dependency treatment in 1986. She declined further treatment for chemical dependency. She was diagnosed with "Acute Stress Disorder; rule out [Post-Traumatic Stress Disorder]." (*Id.*) When her counselor moved out of state, Erickson was referred to another mental health center for ongoing therapy. (*Id.*) However, it does not appear that she followed up in obtaining ongoing therapy. (*See* R. 117)

On September 9, 2001, Erickson was seen in the emergency room with complaints of hand and wrist pain after getting into a fight. She stated she had "slapped" a "human" and a "car surface" repeatedly during the fight. X-rays of both hands revealed no abnormalities. She was given splints for her hands and a work release for September 11 through September 18, 2001. (R. 151, 168-69, 171-72)

On December 9, 2001, Erickson was seen in the emergency room with complaints of left knee pain extending down to the front of her left foot with some swelling. The pain had begun the previous evening. She was able to bear weight on the leg. She noted she was working as a house cleaner, and she went up and down stairs frequently. (R. 163-64) On examination, the doctor observed "very slight, almost imperceptible swelling superior to [left] knee joint and medial to [the] joint without effusion. Cool to touch." (R. 164) Erickson exhibited normal range of motion of her knees bilaterally without crepitation.

She was diagnosed with patellofemoral pain syndrome. The doctor prescribed a knee sleeve and Naprosyn, and referred her to orthopedics. (*Id.*)

On June 10, 2002, Erickson underwent a psychiatric evaluation to "try[] to get back in therapy." (R. 140-44) Doctors found her to be well developed, well nourished, appropriately dressed and groomed, and talkative. She exhibited no abnormal involuntary movements, and had normal psychomotor behavior. Her mood was noted to be mildly dysthymic and her affect was "a bit low energy." Other than her self-report of a history of depression and recent sexual trauma, the evaluation basically was normal. The psychiatrist noted Erickson had current "signs and symptoms compatible with the depressive picture," and he diagnosed her with dysthymic disorder and alcohol abuse, and assessed her GAF at "55 and 60." (R. 141-42) He encouraged Erickson to get substance abuse treatment but noted she was "not terribly interested." (R. 142) She was referred for psychotherapy at her request, and her Celexa dosage was increased. (*Id.*)

On June 19, 2002, Erickson saw a doctor with complaints of bilateral hip and knee pain since January, increasing over the previous few months. She stated her left knee pain woke her at night, and she experienced pain when climbing stairs or squatting. (R. 147) She underwent x-rays of both knees and her pelvis that revealed no significant findings. (R. 149-50) However, an MRI of her pelvis on July 11, 2002, revealed degenerative changes and joint space narrowing in her hip joints, and "minimal joint fluid" in both hips. (R. 148)

On August 12, 2002, Erickson saw Jennifer Ryan, Ph.D. for a counseling session. Notes indicate Erickson's "mood appeared depressed and affect was appropriate to her mood." (R. 139) Erickson was advised to attend regular weekly therapy sessions in order to make progress. (*Id.*)

On August 22, 2002, John Tedesco, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form. (R. 119-22) He found Erickson

would have moderate limitations in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 119-20) In his review summary, Dr. Tedesco noted Erickson had medically-determinable mental impairments including "dysthymia, alcohol abuse, and a history of acute stress disorder." (R. 117) He found her impairments to be severe, but not at the Listing level of severity.

Dr. Tedesco noted Erickson's GAF during her 2001 mental health treatment was 55/60, which was consistent with her GAF scores during earlier treatment. He indicated a GAF level of 55 "is indicative of moderate as opposed to marked symptomatology." (R. 117-18) He noted there were no findings of note from Erickson's June 10, 2002, psychiatric evaluation, and she had declined treatment for chemical dependency. (*Id.*)

Dr. Tedesco also referred to a work assessment from August 2001 to January 2002, in which Erickson was "rated as performing adequately in almost all respects. The one exception would be her motivation and the fact that she stopped showing up for work. Employer did feel that she had too many personal problems that interfered with her employment at that time. Nevertheless, [she] did perform adequately when present." (*Id.*) He further noted Erickson's activities of daily living failed to show marked functional impairments resulting from her mental condition. (R. 118)

Based on his review of the record, treating source opinion regarding Erickson's general functioning, the recent work performance assessment, and Erickson's reported activities of daily living, Dr. Tedesco reached the following conclusions:

> Based on the evidence available, the claimant's primary deficit is in the area of motivation and dependability. She is likely to experience moderate limitations in her ability to tend to tasks on a regular basis. Thus, she may have limitations in her ability to complete a normal work week without interruption

12

> from her mental symptoms. She is also likely to have
> moderate limitations in her ability to attend and maintain
> concentration for extended periods of time. Nevertheless, she
> does retain the ability to do so for short periods of time.
> Mental status examination and ADLs suggest these skills
> remain intact.

(R. 118)

Erickson cancelled her August 26, 2002, counseling appointment, stating her daughter was ill. (R. 138)

On September 4, 2002, Erickson was seen for follow-up of her hip pain. She continued to complain of bilateral hip pain. She stated her hips would "catch, crackle," and then "pop," and the pain "about 'brings her to the ground.'" After the pop, the catching and crackling would be gone. Examination revealed full range of motion of her hips bilaterally, but Erickson stated "she thought her hips needed to pop." (R. 146) She was diagnosed with iliopectineal bursitis, and was referred for physical therapy, a home exercise program, and stretching. (*Id.*)

On October 2, 2002, Erickson underwent a disability examination by Gary Greenberg, M.D. (R. 123-27) Erickson gave a history of "persistent multiple joint pains for at least five years, . . . mainly in the hip and knees and to a lesser extent other joints." (R. 123) She also complained of "a grinding sensation in the large joints and a popping sensation," as well as "a lot of stiffness," and "poor sleep." (*Id.*) She stated her pain was worst in the morning upon arising, lessening somewhat throughout the day into the evening. (*Id.*) She had attended a few physical therapy sessions but found them "difficult due to the pain and stiffness." She was taking primarily Motrin for pain, and Celexa and Trazodone for depression. She reported the antidepressant medications relieved her symptoms by "about 50%." (*Id.*) She reported smoking about a pack of cigarettes daily, occasional drinking, and no use of street drugs. She reported her last full-time job was cleaning houses in January 2002, and she stated her pain had worsened considerably since

that time. She opined she could walk only about two blocks before her hips would begin to hurt and she would have to stop and rest. She indicated she could stand or sit for only about ten to fifteen minutes at a time. (R. 124)

On examination, Dr. Greenberg found Erickson to have "satisfactory strength and range of motion of the neck and upper extremities," with 100% grip strength bilaterally, "no flank tenderness," "slightly reduced range of motion of the back," and "satisfactory range of motion of the hips and knees and large joints." (*Id.*) Straight-leg-raising and Patrick's tests were negative bilaterally. She had a "fairly normal" gait, "satisfactory" bilateral lower extremity strength, and she was able to walk on her heels and toes, though she could not squat. He noted Erickson "mainly complains of stiffness in the large joints at the present time as well as the pain." (*Id.*)

Dr. Greenberg diagnosed Erickson with "Arthralgia of multiple joints mainly in the hips and knees"; a previous diagnosis of "patellar femoral syndrome with bursitis in both hips"; and "Depression partially improved." (*Id.*) Based on his evaluation, the doctor opined Erickson would have the following functional limitations:

> The patient's ability to lift and carry is hard to determine. I think she could probably carry 15 pounds fairly frequently. Stooping, climbing, kneeling and crawling may be more difficult. I don't think she is at present capable of a lot of maneuvers of that sort. Handling objects in terms of gross and fine motor movements seem[s] intact. Her vision, hearing and speaking seem intact. Traveling is somewhat restricted due to joint pain and stiffness. Dust, fumes and temperature environments are noncontributory.

> In summation the patient has multiple joint pains and stiffness mainly of the large joints but other joints as well to a certain extent. The etiology is really unclear. She has a depression which appears to be improving but still present. She does not appear to have any obvious clinical findings of joint disease, at least on physical examination. I think it would be a good idea for a rheumatologist to see her for further evaluation.

14

(R. 124-25)

On October 13, 2002, Jan Hunter, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. The doctor opined Erickson could lift up to twenty pounds occasionally and ten pounds frequently; stand, walk, and sit for up to six hours each in an eight-hour workday, with normal breaks; push/pull without limitation; and perform all postural activities occasionally. (R. 129-30) In a narrative summary, Dr. Hunter indicated Erickson's credibility was "significantly eroded by the absence of objective criteria which would be supportive of the degree of restriction she alleges. X-rays reveal only minimal degenerative joint disease, and at the time of the [consulting examination,] joint range of motion was essentially normal, and there was no evidence supportive of significant arthritic involvement." (R. 157) On April 18, 2003, Claude H. Koons, M.D. reviewed the evidence, and concurred in Dr. Hunter's conclusions. (R. 135)

Erickson saw her mental health counselor on October 14, 2002. She stated her depression had worsened over the past two months, and her medications no longer were helping with her sleep or mood. Notes indicate the "[s]ession focused on goals of reducing depressive symptoms, coping skill development and relationship issues." (R. 136)

On November 14, 2002, Erickson went to see a doctor about an unrelated problem, and mentioned during her history that "she has multiple problems with her joints. Said that she feels like every joint in her body hurts, and this has been going on for months, just continual problems, especially in the hands. Also feels that her muscles are very sensitive. She says she can barely brush up against something, and has a significant amount of pain, especially in the thigh area bilaterally. She does have a family history of fibromyalgia." (R. 158) On examination, Erickson reported significant pain with light palpation of her upper thighs, and tenderness with manipulation of both wrists and hands. The doctor noted Erickson had no family history of rheumatoid arthritis. A sed rate and other lab tests were

ordered, and Erickson was referred to Mary A. Radia, D.O., a rheumatologist, for evaluation *Id.*

Erickson saw Dr. Radia for a consultation on January 8, 2003. (R. 175-80) Erickson gave the following history of her musculoskeletal complaints:

> She stated this began a year ago with pain in the right lateral leg with fast and prolonged ambulation. She then started having problems with the temporomandibular joint and both knees. She states she saw orthopedics and was told she had patellofemoral syndrome. Currently, she reports that she aches head to toe and feels like her bones are hollowed out. Weather seems to affect how she does. She reports restless sleep and awakens exhausted. If she sleeps on her back, her arms will go numb and if she sleeps on her side, the area over the greater trochanters will hurt. She states she has been told she has bursitis in this area, as well. She has two hours of morning stiffness with gel [sic]. She states she had to quit her job in housekeeping because of these symptoms and is currently unemployed. She has two children, ages 11 and 13 and is a single parent. Treatments she has tried include physical therapy, which aggravated symptoms, so she quit. She reports a combination of modalities and exercises at Broadlawns [Medical Center in Des Moines, Iowa]. She has not tried water exercise. She tried ibuprofen, up to 800 mg b.i.d. without relief, which upset her stomach.

> She has been on trazodone 50 mg q.p.m. for a year without relief of sleep problems and has been on Celexa for a year, but she is not sure if this helps. . . . Family history is positive for her mother having fibromyalgia.

(R. 175)

On examination, Erickson exhibited good mobility in her upper and lower extremities, intact muscle strength, and no synovitis. The doctor noted Erickson had "multiple symmetrical tender points in the neck, trapezius, pectoral area, in the buttocks, above the elbows and knees and over the greater trochanters." (*Id.*) Her lab results from November 14, 2002, showed a sed rate of 5 and negative rheumatoid factor. (*Id.*)

Dr. Radia noted the following conclusions and treatment recommendations:

> Patient has severe myalgias compatible with fibromyalgia as
> she has multiple symmetrical tender points, poor sleep and
> fatigue. . . . She was given educational materials on fibro-
> myalgia, pain, stress and fatigue. To treat her fibromyalgia
> symptoms, I recommended warm water exercise therapy at
> Mercy and she was given a prescription for this. I explained
> that ibuprofen does not help this pain much, and as she is
> having gastrointestinal symptoms, I would not recommend she
> take it very often. I recommended she increase her trazodone
> to 100 mg q.h.s. as it is not helping her sleep at the lower
> dose. She was also given tramadol 50 mg up to q.i.d. p.r.n.
> for acute pain management and advised to watch for constipa-
> tion and sedation from this. I have not found Celexa particu-
> larly helpful for pain management in fibromyalgia and recom-
> mended she taper off by decreasing to 10 mg q.d. for six days
> and then discontinue. At that point, she could start Effexor
> XR 37.5 mg q.d. for a week, 75 mg q.d. the next week and
> then 150 mg q.d. It will take about 4-6 weeks to get the full
> effect of this change. A return appointment was recommended
> in three months to re-evaluate, but she was strongly
> encouraged to call if she has problems with the medications.

(R. 175-76)

Erickson returned to see Dr. Radia on April 8, 2003. She reported sleeping better with the Trazodone. Effexor initially helped her pain somewhat, but her pain had increased over the previous few weeks. She also experienced increased pain with weather changes and at the time of her menstrual periods. She reported periodic, shooting pain in her left elbow and the bottoms of her feet. Examination revealed multiple symmetrical tender points. The doctor increased Erickson's Effexor and Tramadol dosages. (R. 222)

On reconsideration of the denial of Erickson's application for SSI benefits, David A. Christiansen, Ph.D. reviewed the record on April 23, 2003, and concurred in the conclusions reached by Dr. Tedesco in his August 22, 2002, review. (R. 182)

Erickson saw Dr. Radia on October 2, 2003, for reevaluation of her fibromyalgia. She reported doing well over the summer but her symptoms had increased over the previous two months, "with lower abdominal discomfort and aching into the legs with burning, soreness, and a hollowed out feeling." (R. 221) She also complained of stiffness in her neck, more fatigue, and poor memory. Hot baths gave her some relief, and she slept well when she took the Trazodone. She had stopped taking Tramadol because it made her drowsy and irritable. On examination, she had good mobility of all of her extremities, no synovitis, and multiple symmetrical tender points. The doctor continued her on Effexor and Trazodone, and added Wellbutrin, noting this could help Erickson's fatigue, memory, and concentration issues. She also opined Erickson would benefit from several sessions with a physical therapist to implement a home exercise program for fibromyalgia, but she was unable to schedule this due to a MediPass requirement that it go through Erickson's primary care provider, listed as Broadlawns  (*Id.*)

Erickson returned to see Dr. Radia on November 24, 2003. She reported little change since her last visit. She complained of some pain and grinding in her neck with movement, and she stated she felt "twitchy." (R. 220) She had not started the Wellbutrin as recommended "because she was worried about having a seizure because she had drunk alcohol in the past." (*Id.*) Examination revealed good mobility of her upper and lower extremities with multiple symmetrical tender points and no synovitis. The doctor stated the chance of seizure on the Wellbutrin was minimal, and she advised Erickson to begin taking the medication, which Erickson agreed to do. She also encouraged Erickson to work on a home stretching and exercise program. (*Id.*) The doctor concluded her notes with the following: "[Erickson] reports that she did file for social security disability and requests that I notify her social worker that she would not be able to participate in promise jobs, and I sent a fax to that affect [sic]." (*Id.*)

On February 12, 2004, John D. Kuhnlein, D.O., a specialist in occupational and environmental medicine, performed a consultative examination of Erickson at the request of Disability Determination Services. (R. 196-208) The doctor reviewed Erickson's symptomatic and treatment history with her, and noted Erickson had the following current complaints:

> Ms. Erickson currently complains of pain in the right buttocks that radiates down both legs to her knees. She relates that her hands tingle at times into all of her fingers. She states that she has problems with her feet developing a burning pain to the point that she is not able to stand for very long periods of time because of her pain. She has been told that she has high arches. She states that her memory is bad and she cannot recall what she does or says, sometimes on a momentary basis. She believes that she becomes disoriented at times, but states that she is still driving, does not have any problem driving, and does not get lost. She does relate that she does get a little anxious. She states that she has difficulty with comprehension.
>
> Static positions such as laying or sitting make her symptoms worse. She states that when she goes to the store she leans on the cart because of [her] discomfort. Sitting or standing can also make her symptoms better by changing positions. She also relates by history that she believes that her hips and knees dislocate, and she also complains that her knees grind.

(R. 197)

Erickson reported smoking one pack of cigarettes daily, drinking four vodka drinks per week. and drinking twelve non-diet soft drinks per day, with her last caffeine intake at about 10:00 p.m. She stated she was sleeping four to twelve hours per night, and the pain in her legs, back, hips, and arms kept her awake. Regarding her activities of daily living, Erickson reported the following:

> She usually arises between 8:00 a.m. and noon. She states that she gets up and down a lot. She states that with any significant activity she has to sit down or stand up. She usually goes to bed about 11:30 at night. . . . She relates that she has

> difficulty with some self-care personal hygiene activities such
> as brushing her teeth or bathing. She relates problems with
> practically any physical activity. She states that she has
> difficulty hearing, seeing, feeling with her fingers or smelling
> with regard to problems with sensory functions. Nonspecified
> hand activities such as gripping, grasping, pulling or carrying
> with her hands [are] also difficult for her. She believes that
> traveling, riding in a car or driving is also difficult.

(R. 199) According to Erickson, Dr. Radia had assigned her a lifting, pushing, and pulling restriction of ten pounds, with no kneeling. (*Id.*)

From his physical examination of Erickson, Dr. Kuhnlein opined she should be able to lift up to fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk for up to six hours in an eight-hour workday, with normal breaks; sit without limitation; and push/pull up to forty pounds occasionally. He opined she could perform all postural activities occasionally, and the only limitation she would have in her manipulative activities was a restriction that she perform reaching activities only below the shoulder. (R. 205-07) The doctor noted that based on Erickson's complaints, "she would self limit activities although she would be physically capable." (R. 207) He further indicated Erickson's psychological issues might "create safety hazards in working around operating machinery; this is uncertain without psych evaluation addressing this issue. There would be no physical limitations [in her ability to work around hazards] per se." (R. 208)

On February 17, 2004, Erickson underwent a psychological evaluation by Raymond Tibe, Psy. D., at the request of Disability Determination Services. (R. 209-17) Erickson's self-report regarding her history was consistent with her reports to other doctors and consultants in the past. Dr. Tibe administered the WAIS-III, which indicated Erickson has a Verbal IQ of 86, Performance IQ of 87, and Full Scale IQ of 86, which the doctor noted was in "the low average range of cognitive functioning." (R. 211, 214) He noted the testing indicated Erickson may function at a slightly higher level when time constraints are not present. (R. 211) Testing also was consistent with Erickson's self-report that she

is depressed and forgetful. (*Id.*) Dr. Tibe observed that Erickson "worked diligently" during the testing, without any undue emotional reactions or idiosyncratic responses. Erickson stated she was fatigued due to poor sleep the night before the tests, so the doctor cautioned that her test results could mildly understate her true functional level. (*Id.*)

Dr. Tibe viewed Erickson's MMPI results as "compromised" and not useful as a diagnostic instrument. He noted Erickson's test results presented two different conclusions:

> First, her data were consistent with a picture of someone who may have tended to over report or exaggerate symptomotology [sic]. This would not be out of a sense of malingering or intent to mislead, but more so out of a sense of a cry for help. In other words, the idea is someone crying out for help and as a result saying anything and everything is wrong.
>
> At the same time, there was suggestion of a possible tendency to present self in as positive a light as possible – to put the best foot forward so to speak. Sometimes people who want to do this tend to underestimate difficulties. The point of all this is the validity data suggest a possible complicated approach to the scale. There was data to suggest possible defensiveness along with cry for help.

(*Id.*)

Using the MMPI results more as "a source of hypotheses regarding functioning," the doctor suggested the following conclusions could be drawn from Erickson's test results:

> [T]he client's MMPI data were consistent with the picture of an individual who presents with many somatic problems and concerns. This person feels physically ill. She appears highly concerned about her health and bodily functioning. This high level of concern and sensitivity at times might lead to overreaction. These are folks who appear to be tense, angry and nervous. They tend to feel unhappy. At times, they lose initiative. They tend to doubt their own abilities and tend to be extremely sensitive.

The data went on to be congruent with someone who may be very shy. People who score as she did tend to keep things to themselves and don't easily open up and share things about themselves. The data went on to suggest a person who worries and fusses a great deal. There is almost an obsessive quality to the level of anxiousness and how she wrestles with things. The data went on to suggest a person who feels strained and constrained by her environment. People who score as she did do not feel relaxed or calm. Rather, they feel that things are hard and they must maintain vigilance. The data went on to be consistent with depression. People who score as she did may wrestle with many signs and symptoms of depression. There could be sleeping problems and appetite problems. The data were consistent with someone who feels little energy or motivation. The data went to be consistent with someone who may well have adopted the traditional feminine identity. As such, she may be a person who is highly concerned about relationships. She may be more of an internal person as opposed to an external doer.

Overall, there were many MMPI indices consistent with the picture of someone who feels bad. She feels that life is coming undone. She is under a great deal of stress and feels quite overwhelmed at this time. The only diagnostic impression that I would take from the data is the high probability that this client is wrestling with depression.

(R. 211-12) He concluded Erickson's MMPI results were "consistent with depression and a high level of concern regarding physical health." (R. 213)

Dr. Tibe's evaluation yielded a diagnosis of depressive disorder NOS, and possibly "some residuals of a possible PTSD condition," noting Erickson still had dreams regarding her rape. (*Id.*) He gave her a current GAF of 52. (*Id.*)

Regarding work-related activities, Dr. Tibe opined Erickson would have moderate limitations in her ability to understand, remember, and carry out detailed instructions, and to respond appropriately to work pressures in a usual work setting. He opined she would

have marked limitation in her ability to interact appropriately with the public. (R. 216-17) He indicated Erickson "would need multiple breaks" during the workday. (R. 217)

On February 23, 2004, Erickson returned to see Dr. Radia for follow-up of her fibromyalgia. She stated her pain had increased since her last visit, occurring "in a new area the last two days of the neck and left shoulder." (R. 218) She complained of tingling in the fingertips of her right index, middle, and ring fingers for two weeks, and increased burning in her feet when she was up and around. She reported Wellbutrin made her dizzy and did not increase her energy. Dr. Radia offered to prescribe physical therapy for Erickson's upper quadrant pain, but she noted Erickson "would like to wait and see if she improves on her own." (*Id.*) The doctor continued Erickson on Trazodone and Effexor, and increased her Neurontin dosage. She gave Erickson a letter to excuse her from jury duty. (R. 218-19)

Erickson saw Dr. Radia again on June 28, 2004. She reported increasing back pain at the sacrum in the midline. She stated she was "tired of hurting and having poor memory," and she had been "cutting herself out of frustration on the right arm and leg." (R. 241) She stated she would go see a psychiatrist "if she had the energy to followup [sic] on it." (*Id.*) Notes indicate Erickson had a flat affect and poor eye contact. Healed lacerations were visible on her right inner arm and leg. She had good mobility of her upper and lower extremities, multiple symmetrical tender points, and no synovitis, and straight-leg-raising test was negative. (*Id.*) Dr. Radia strongly advised Erickson to obtain a psychiatric referral. She increased Erickson's Neurontin dosage, and refilled her Effexor and Trazodone. She also counseled Erickson on "the use of imagery and reviewed how to do this." (*Id.*)

Erickson's next follow-up with Dr. Radia was on August 9, 2004. She reported continuing low back pain in the sacral region, radiating down her lateral thighs to her knees with sharp, shooting pains. She had pain and tingling in her right lower leg and

ankle, stating her ankle would "feel weak and give out when she does increased activities such as mowing her yard." (R. 239) She reported intermittent weakness overall, and sleep disturbance due to discomfort. She had increased her Neurontin as prescribed at her last visit, but noticed no change in her symptoms, and she requested "something stronger for pain." (*Id.*) She had not followed up with a psychiatric evaluation as recommended by Dr. Radia. On examination, the doctor noted Erickson had no new cutaneous lesions from cutting herself. She had good mobility of her upper and lower extremities, crepitus on extension of her left knee, diffuse tenderness across the lumbosacral region, and multiple symmetric tender points. Diagnostic impressions included "Fibromyalgia with increased symptoms," "Low back pain," and "Radiculopathy in the lower extremities." (*Id.*) The doctor increased her Neurontin dosage, and prescribed Tramadol for pain. She scheduled an MRI of Erickson's lumbar spine as well as x-rays. (R. 239-40)

On October 11, 2004, Dr. Radia completed a Medical Source Statement form with narrative summary. (R. 230-34) She opined Erickson would have the following limitations in her ability to perform activities "on a sustained basis in a routine work setting": lift less than ten pounds occasionally and frequently, noting "[r]epetitive use of extremities aggravates symptoms" (R. 231); sit for no more than one hour at a time for a total of four hours in a normal workday, due to "increased pain and stiffness with immobility" and "[r]adicular pain reported when sitting" (*id.*); stand/walk for no longer than fifteen minutes at a time, for a total of no more than one hour per day, based on "[r]adicular pain down legs reported if standing/walking" (R. 232); the need to lay down or take breaks for ten to fifteen minutes each hour, which would "[a]llow[] change in position to reduce pain levels" (*id.*); perform reaching activities for no longer than ten minutes at a time, for a total of one hour a day, and perform handling activities for no longer than fifteen minutes at a time, for a total of no more than two hours in a workday, because "[r]epetitive movement causes pain" (R. 233); and perform fingering activities for

no longer than ten minutes at a time, for a total of no more than one hour in a workday, also because of the pain brought on by repetitive movements. (R. 234) Dr. Radia offered the following opinions in her narrative summary:

> An MRI was done which showed minimal disk bulging and desiccation at L4/L5 without nerve root compromise. Mild facet osteoarthritis was noted on her plain x-ray. She was noted to have six lumbar vertebrae, but no other structural abnormalities.

> The patient appears to have a significant psychiatric component of depression, and I have recommended a psychiatric evaluation on several occasions, but I have not received any information back as to whether or not she has followed up on this.

> [Erickson's] limitations would be restricted primarily by the levels of pain that she has affecting her ability to do repetitive activities or to be immobilized in one position for more than one hour. She would require more frequent rest periods with a change in position and stretches to minimize her discomfort. Her pain symptoms would be aggravated by having to do any physical lifting or repetitive use of her arms, hands, or feet.

(R. 230)

Erickson saw Dr. Radia for follow-up on October 15, 2004. She reported increased pain in her feet, especially when she first arose in the morning, decreasing as she moved around. The doctor observed "some healing cuts on the inner forearms consistent with recent self-mutilation." (R. 235) Erickson continued to have good mobility in all of her extremities, with multiple symmetrical tender points. She was advised to contact her primary care physician at Broadlawns for a referral to a podiatrist for evaluation and treatment of plantar fasciitis, a condition Dr. Radia noted "is frequently found in fibromyalgia patients." (*Id.*) She refilled Erickson's Effexor and Neurontin, encouraged her to take the Tramadol more regularly to prevent pain flare-ups, and indicated she could increase her Trazodone occasionally as needed. (*Id.*)

### 3.    *Vocational experts' testimony*

#### a.    *June 10, 2004, hearing*

VE Carma Mitchell summarized Erickson's vocational profile as follows:

> She's 33 years old and a younger individual with a
> ninth-grade education.  Her past work has included work as a
> short order cook which was semi-skilled and light, and light as
> she did it.  Also, a security guard which was semi-skilled and
> light as per the DOT, and light as she did it.  She also did
> work as a survey worker which was unskilled and light as per
> the DOT, but sedentary as she performed it and described in
> the file information.  And the other work was a day worker or
> a housecleaner which was unskilled and medium as per the
> DOT, and medium as she described it.

(R. 386)  The ALJ asked the VE to consider an individual with Erickson's vocational profile who is able to lift/carry fifteen pounds frequently; stoop, climb, kneel, and crawl occasionally; travel only occasionally due to joint pain and stiffness; and suffers from some depression.  (*See* R. 386)  The VE indicated this individual would be able to return to Erickson's past work as a survey worker, security guard, and short order cook.  (R. 387)

The ALJ next asked the VE to consider the same individual, but to add a GAF varying between 55 and 80, with restrictions based on a diagnosis of acute stress disorder. The VE responded that if the individual's GAF were 80, the individual should be able to return to all of Erickson's past work.  However, if the individual's GAF were 55, "there could be some moderate limitations as generally thought in functioning, like for work." (R. 387)  For example, the person's ability to deal with the public or other people could be impaired, or "there could be some functionings that would affect [the] person's ability to do semi-skilled work[.]"  (R. 387-88)  Therefore, depending on the person's level of impairment, "the person could have difficulty performing [Erickson's] past jobs, at the [GAF] level of 55."  (R. 388)  In other words, with the uncertain GAF range, the VE was

unable to state whether the hypothetical individual would be able to return to any of Erickson's past work. (*Id.*)

The ALJ next asked the VE to consider an individual with a "diagnosis of depressive disorder n.o.s., and some possible residuals of post traumatic stress condition"; a GAF of 52; a full-scale IQ of 86 and "working memory of 75," which "may imply difficulty keeping complex data in her mind"; moderate limitations in understanding and remembering and carrying out detailed instructions, and in responding appropriately to work pressures in the usual work setting; marked difficulty interacting appropriately and dealing with the public; and no difficulty interacting appropriately with supervisors and coworkers, making judgments on simple work-related decisions, and coping with changes in routine. (R. 388-89)

The VE responded that with the marked limitation in dealing with the public, this hypothetical individual would be unable to work as a security guard or survey worker, but could work as a short order cook. (R. 389) The VE expressed surprise that Dr. Tibe had opined Erickson, with a GAF of 52, would have no limitations dealing with coworkers and supervisors. However, the VE indicated if that were the case, then Erickson should be able to do light, unskilled jobs including house cleaner, cafeteria attendant, and marker/labeler, although the numbers of those types of jobs available to her would be reduced by about half due to Erickson's fifteen-pound lifting limitation. (R. 390-91)

The ALJ next asked the VE to consider an individual with the limitations found during Dr. Kuhnlein's February 12, 2004, consultative examination. (*See* R. 196-208) These included lifting limitations of fifty pounds occasionally and twenty-five pounds frequently; stand and walk about six hours in an eight-hour workday; "limited in her upper extremities to 40 pounds occasionally, and lower extremities . . . to that also"; "occasional lifting by her weight"; "patella femoral syndrome by history, psych issues"; "self-limit because of pain behavior"; "unlimited in manipulating below her shoulder"; "self-limiting

activities, although she would be physically capable"; "psych issues may create safety hazards if working around operating machinery"; but "there would be no physical limitations, per se, other than self-limitation." (R. 392-93)

The VE stated that with those limitations, Erickson "could do all of the housekeeping jobs, and all of like the cafeteria attendant jobs. . . . [S]he could do the short order cook job as she did it and as per the DOT," as long as she would not be prevented from using knives. "And then she could also do the day worker, as well, with this because it's up to 50 pounds." (R. 393-94)

The VE noted that if Erickson's testimony were taken as true with regard to her inability to be around coworkers and supervisors, she would be unable to perform any type of competitive work. (R. 395-96) Similarly, if Erickson's testimony regarding her physical limitations were taken as true, she would be unable to work "because she couldn't tolerate the sitting or standing." (R. 397) In addition, if Erickson were required to take ten minutes of each hour for a break, or total breaks during the day that would add up to forty-five minutes in addition to regularly-scheduled morning, lunch, and afternoon breaks, the person would be unable to maintain competitive employment. (R. 398)

### b.    July 18, 2006, hearing

The ALJ asked VE Marian Jacobs the following hypothetical question:

> This would be for currently a 35-year-old woman with a[] ninth grade education, past relevant work as noted in [the Past Relevant Work summary, R. 350]. She's been diagnosed with fibromyalgia, depression and she's got a past history of substance abuse that appears to be in remission. . . . For this first hypothetical I'd limit her as follows. She could lift 10 pounds occasionally, five pounds frequently. She could only occasionally balance, stoop, crouch, kneel, crawl or climb. She'd be limited to simple, routine, repetitive work [at] no

> more than a regular pace.  With those limitations[, could she
> do] any past work?

(R. 421-22)

The VE initially responded that the hypothetical individual could not do any of Erickson's past relevant work, but then stated she could return to Erickson's past job as a survey worker, noting that as Erickson performed the job, "she was seated and had nothing to lift."  (R. 422)  The VE further indicated the individual could perform sedentary work such as an envelope addresser or package sorter, egg processor on a production line, or cutter and paster of press clippings, all of which jobs the VE stated exist in substantial numbers in Iowa and the United States.  (*Id.*)  If this individual had "difficulty in maintaining attention and concentration and carrying out instructions on an occasional basis up to one-third of an eight-hour workday," the individual would not be employable.  (R. 423)  Similarly, if the individual were able to stand for only one hour and sit for only four hours, total, in an eight-hour workday, the individual would be unable to work on a full-time basis.  (R. 423-24)  If the individual were able to reach, handle, and finger for only two hours total in an eight-hour workday, the individual also would be unemployable.  (R. 424)

The ALJ asked the VE to consider the same individual described in his first hypothetical question, but to add the limitation that the individual must "alternate between standing and sitting every quarter hour and she's going to require a slow pace for up to one-third of the day."  (R. 423)  The VE stated this individual would not be employable.  (*Id.*)

### 4.  *The ALJ's decision*

The ALJ found that although Erickson had some earnings after her alleged onset date, she had not engaged in substantial gainful activity since her alleged onset date.  (R. 284)  He found that she "has severe impairments of fibromyalgia, depression, and a

history of drug and alcohol abuse," but further found none of her impairments reach the Listing level of severity. He found substance abuse was not material to the case. (R. 288) He found Erickson has limitations due to her mental impairments consisting of "mild restriction of activities of daily living, mild difficulties in social functioning, moderate difficulties maintaining concentration, persistence, or pace, and . . . [no] episodes of decompensation." (*Id.*)

The ALJ found Erickson's subjective complaints were "not generally credible" and gave them little weight. In explanation, the ALJ noted Erickson had been noncompliant with her treating physician's recommendation that she obtain psychiatric treatment and physical therapy, based on Erickson's belief that neither of those helped her. He noted Erickson's condition improves when she takes her medications consistently. The ALJ observed that throughout Erickson's treatment by Dr. Radia, the doctor indicated Erickson tended to exaggerate her symptoms, "appeared to be crying out for help," and repeatedly was advised to seek psychiatric care. The ALJ found the doctor's treatment notes regarding Erickson's functional abilities to be inconsistent with Erickson's subjective complaints, and the ALJ considered the doctor's recommendations in reaching his assessment of Erickson's residual functional capacity. (R. 286-87)

The ALJ found Erickson "retains the residual functional capacity to occasionally lift 10 pounds and frequently lift 5 pounds"; "occasionally balance, stoop, crouch, kneel, crawl, or climb"; and "perform only simple, routine, and repetitive work at no more than a regular pace." (R. 287) Based on the VE's testimony, the ALJ found a person with these limitations should be able to return to Erickson's past work as a survey worker, as Erickson had performed the job. In addition, she would be able to perform a range of sedentary, unskilled work, including, for example, an addresser, package sorter; egg processor; and cutter, paster. (*Id.*) As a result, the ALJ found Erickson is not disabled and is not eligible for SSI benefits. (R. 288)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."

*Kirby*, *supra*, 2007 WL 2593631 at \*2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.

20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant

numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004);

*Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding

the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

As noted previously, the Commissioner seeks another remand of this case for further consideration. The Commissioner asserts "the record remains deficient, particularly with regard to the limiting effects of [Erickson's] fibromyalgia." (Doc. No. 15, p. 4) Erickson, on the other hand, argues the ALJ failed to give proper weight to Dr. Radia's opinions. She argues Dr. Radia's opinions are supported by medically-acceptable clinical and laboratory testing, and establish that Erickson is disabled due to fibromyalgia. Simply stated, the court agrees with Erickson.

The ALJ gave substantial weight to the opinions of agency consultants, none of whom is a rheumatologist, and only one of whom actually examined Erickson. Dr. Radia has treated Erickson since January 2003. Her objective findings confirmed the diagnosis of fibromyalgia. Each time she examined Erickson, she noted the presence of multiple symmetrical tender points. "[T]rigger-point test findings consistent with fibromyalgia constitute objective evidence of the disease." *Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006) (citation omitted).

It is apparent from both the ALJ's decision and the agency consulting physicians' discussions of Erickson's condition that none of them understands and appreciates the debilitating effects of fibromyalgia. Dr. Kuhnlein was the only consulting physician to actually examine Erickson for purposes of evaluating her physical functional abilities. Although he noted Erickson had seen Dr. Radia, who "felt that she had severe myalgias compatible with fibromyalgia and began conservative care" (R. 197), he did not mention fibromyalgia again in his discussion of Erickson's functional abilities. The other consulting physicians performed only a paper review of the record, something the Eighth Circuit has

referred to in the past as "medical sophistry at its best." *Nelson v. Heckler*, 712 F.2d 346, 348 (8th Cir. 1983) (citations omitted). To find Erickson disabled, Dr. Kuhnlein, like the ALJ, apparently would require some objective medical test, like a blood test or x-ray, that would confirm a diagnosis of fibromyalgia. Yet even the courts have observed that fibromyalgia is "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, . . . Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). The Eighth Circuit has held, "in the context of a fibromyalgia case, that [even] the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." *Brosnahan*, 336 F.3d at 677 (citing *Kelley v. Callahan*, 133 F.3d 583, 535-89 (8th Cir. 1998)).

The ALJ also failed to discuss the potential side effects from Erickson's medications, one of which could be the difficulties with memory and concentration described by Erickson. He took issue with treatment and evaluation notes indicating Erickson was "crying out for help," without considering whether her cries for help were warranted by her condition. While it is true that Erickson's failure to follow through with treatment recommendations that she seek psychiatric care detracts from the credibility of her subjective complaints, *see, e.g.*, *Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (citing *Harwood v. Apfel*, 186 F.3d 1039, 1045 (8th Cir. 1999); *Black v. Apfel*, 143 F.3d 383, 386-87 (8th Cir. 1998)), the physical effects of her progressive fibromyalgia render her disabled even in the absence of her accompanying depression.

Dr. Radia is Erickson's primary treating physician. Her findings have been consistent in supporting her diagnosis of fibromyalgia. Her opinions are based on objective clinical findings and they are not at odds with the other substantial evidence of record. As a result, her opinions should be given great weight. *See Prosch v. Apfel*, 201

F.3d 1010, 1012-13 (8th Cir. 2000); *Wiekamp v. Apfel*, 116 F. Supp. 2d. 1056, 1063-64 (N.D. Iowa 2000) (Bennett, C.J.).

When the VE was presented with a set of limitations consistent with Dr. Radia's opinion regarding Erickson's functional abilities, the VE indicated Erickson would be unable to work in a competitive environment. As the Eighth Circuit noted in *Forehand v. Barnhart*, 364 F.3d 984, 987 (8th Cir. 2004):

> We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). This test is consistent with relevant regulations on the issue, *see* 20 C.F.R. § 404.1545, and we have reiterated it on a number of occasions. . . . [Citations omitted.]

*Forehand*, 364 F.3d at 988. Substantial evidence in the record supports a conclusion that Erickson lacks the residual functional capacity necessary to work, and she therefore is disabled. The undersigned therefore recommends the Commissioner's motion for remand be denied, the Commissioner's decision be reversed, and this case be remanded for calculation and award of benefits.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of

---

[1]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.

a copy of this Report and Recommendation, that the Commissioner's decision be reversed, judgment be entered for Erickson, and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for a finding of disability and for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 16th day of July, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT